UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GILBERT ALLAN SEGAL JR.,

                       Plaintiff,

      -against-

NEW YORK MILITARY ACADEMY (ALL
ENTITIES INCLUDING, BUT NOT LIMITED TO
INSURANCE REPRESENTATIVES, ETC); and
RESEARCH CENTER ON NATURAL
CONSERVATION INC.,

                 Defendants.

Case No. 21-CV-6872-VB

**THIRD
AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

      Plaintiff Gilbert Allan Segal Jr., by their[1] attorneys, Crumiller P.C., as and for their third

amended complaint against defendants New York Military Academy ("NYMA"), and Research

Center on Natural Conservation Inc. ("RCNC"), respectfully alleges as follows, upon

information and belief:

### PRELIMINARY STATEMENT



*Segal's fifth grade yearbook photo from NYMA.*

1.     In the fall 1996, Segal was a happy and energetic child who loved their family, loved to

run and play outside, and enjoyed practicing clarinet. Segal was filled with life and joy. This all

changed in September 1996, after Segal was enrolled in NYMA as a junior cadet. While NYMA

held itself out to the public as a safe environment that raised "courageous and gallant men," in

---

[1] Segal uses the pronouns "they"/ "them" / "their."

reality, it was an unsupervised boarding school plagued with ritual hazing, grotesque physical abuse, and rampant sexual assaults.

2.      In his first days on campus, Segal was regularly attacked by other students who used tube socks filled with soap, brooms, and mops as weapons. Segal was routinely slapped and punched by NYMA's adult staff. And, in their first semester, Segal was brutally knocked unconscious, and gang raped in their own bedroom. The abuse was well known by several members of NYMA's faculty and staff, who chose not to protect Segal. After the physical abuse turned into sexual abuse, Segal reported the assaults to the principal of the Academy. However, instead of helping, NYMA retaliated against Segal by physically reprimanding them in front of the other students. This abuse was frequent and continued unabated throughout Segal's near two-year tenure at NYMA.

3.      This lawsuit seeks justice for Segal against Defendants.

## PARTIES

4.      Plaintiff Segal is an adult nonbinary individual who resides in Newark, Delaware.

5.      Defendant NYMA is a coeducational private military boarding school, organized pursuant to the laws of the State of New York, located at 78 Academy Avenue, Cornwall-On-Hudson, New York 1250.

6.      Defendant RCNC is a non-for-profit corporation organized pursuant to the laws of New York, located at 1 Arden Road, Harriman, New York 10926-0000. Upon information and belief, RCNC acquired NYMA's assets and liabilities through a Chapter 11 bankruptcy auction in 2015.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 1343, as Segal has asserted claims that arise under federal laws of the United States.

8.      The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because complete diversity of citizenship exists, and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

9.      Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391 (b)(2) because the claims arose there.

## FACTUAL ALLEGATIONS

10.      In the fall of 1996, NYMA was a coeducational private military boarding school for grades 5-12. NYMA purported to be a tough-love organization providing services for youth interested in the US armed forces through interscholastic and intramural programming in a highly structured 24/7 military environment, but behind closed doors NYMA was a punitive organization that not only tolerated physical abuse against their students but celebrated it.

11.      NYMA consisted of seven "companies," or military units, that were constructed entirely by students, who were referred to as cadets.   Each company was designed based on the cadet's grade or area of expertise. There was "G Company," which consisted of cadets in fifth through eighth grade. "B Company," which consisted of cadets in ninth and tenth grade. "A Company," which consisted of cadets in eleventh and twelve grade. "F Company," which consisted of female cadets. "Band Company," who participated in NYMA's band. "D Troop" which managed and drilled NYMA's horses. Finally, there was "Headquarters," a company that consisted of predominately eleventh and twelve graders, who had a special leadership role across the entire campus.

12.      Each company was made up of approximately 2-3 platoons, which consisted of approximately 4-5 squads, which included approximately 4-5 cadets each.

13.     Each company had a clear command structure. Each member of a squad reported to their squad leader. Each squad leader reported to their platoon sergeant. The platoon sergeant reported to a 1st sergeant, who was principally tasked with overseeing all platoons. The 1st sergeant reported to a lieutenant, and the lieutenant reported to the "Company Captain," who was usually a senior student, assigned to lead the company. Each company resided in their own barracks; a building used for housing the students.

14.     NYMA required cadets follow a military command structure and obey orders within the chain of command, failure to do so would result in discipline. This discipline would usually take the form of either commands to perform exercises or physical reprimands including, but not limited to, being slapped, punched, or beat with a blunt object like a broom or mop.

15.     Staff was hired to supervise the student's self-governance, however, the expectation at NYMA was that cadets regulate themselves. As such, the appearance of staff on campus was scarce.

16.     For example, supervision of the G Company barracks was set up into three shifts, and only one member of staff was assigned per shift. Given this, only one staff member was expected to oversee the entire barracks, which included 4 floors and approximately thirty students. The three staff members assigned to G Company barracks were Captain Alexander, Captain Garrison, and Lieutenant Kramer.

17.     Staff impressed upon the cadets, particularly those in leadership, that it was their job, and not staff, to watch over their fellow cadets and maintain order.

18.     Staff modeled and perpetuated the use of physical violence as a disciplinary tactic by senior cadets, often slapping or punching disobedient children in front of their peers to assert dominance and send a warning.

19.     By promoting cadets to these senior ranking positions, NYMA absconded its responsibility over the cadets under their care. Instead, they empowered children to exercise control over their more junior counterparts and encouraged physical abuse as a vehicle to assert that control.

20.     At the same time, NYMA maintained a culture of ritual hazing, which took the form of consistent, severe, and pervasive physical and psychological abuse towards the minor cadets by their peers as well as NYMA's adult staff.

21.     Indeed, the academy has a long history of ritual hazing: NYMA openly condoned hazing as part of their curriculum, believing that it built character. Upon information and belief, early versions of NYMA official cadet regulation handbook hailed and encouraged the practice of hazing as a "Rite of Privilege."

22.     In accordance with NYMA's policy of hazing, first year cadets were targeted almost immediately upon their arrival. First year cadets were subjected to ritual "New Guy" rules, which included, but were not limited to, requiring them to memorize and recite long rambling narrations and throw themselves against a wall on demand. If a first year refused, they would be reprimanded.

23.     Another well-known hazing practice directed towards newer recruits included cadets entering the newer cadets' barracks in the middle of the night, covering their heads with a sheet so that they could not identify their abusers, and beating them with socks filled with varied materials intended to convert the sock into a club (i.e., bars of soap or metal locks). This hazing practice was referred to at NYMA as "Lock n' Sock."

24.     Staff encouraged NYMA's senior ranking cadets to implement hazing as punishment for disciplinary infractions and poor grades.

25.     For example, one hazing practice required poor performing cadets appear in a basement shower room in their barracks, where running hot water was used to create a fog that obscured the cadets' view and burned their throats. Senior ranking cadets would then order these cadets to appear in heavy-padded winter dress uniforms and stand at rigid attention with their arms raised parallel before them, balancing approximately ten-pound rifles across their arms. Any cadent who dropped their rifle would be taken to an adjacent room where they would be beaten by NYMA's senior ranking cadets.

26.     This physical abuse would often leave the children with visible bruises and open gashes.

27.     NYMA faculty, who were predominantly civilians and not members of armed forces, were generally aware of the abuse and hazing. Cadets would routinely enter classrooms clearly beaten, bleeding, and/or limping. However, these clear signs of physical distress were ignored by faculty. When a cadet did try to report the abuse, the report was not escalated to the authorities, but rather relayed back to NYMA staff. Unfortunately, more often than not, NYMA staff would ignore the complaints or punish the cadet for complaining.

28.     NYMA took extensive efforts intended to conceal the harm that was being subjected by their staff and cadets. First, the very nature of a boarding school made the visible signs of physical abuse only visible to NYMA faculty and staff – who permitted the abuse.

29.     Moreover, NYMA maintained a policy where – even in the most extreme scenarios – cadets would not be sent to local hospitals or other medical clinics outside of the campus. This policy was maintained, in part, to avoid outside medical providers discovering the abuse and reporting it to the parents or the authorities. Instead, NYMA had its own infirmary that delivered medical care to the cadets. NYMA employed its own private doctor who provided substandard

care and didn't ask questions. The doctor would simply provide any immediate remedy – often

without any diagnostic testing – and send the child back to class or to their barracks.

30.     All phone calls at the academy were monitored by NYMA staff. Whenever a cadet

would try to disclose the abuse, their call would be abruptly interrupted by staff who would end

the call. Following this, the cadet would often be scolded at length, told that they were "liars,"

and that lying was "part of the reason" they were sent to the academy in the first place.

31.     At the same time NYMA was running an organization fraught with hazing and abuse –

with little adult supervision – it held itself out to parents of prospective students as a secure

academy that was capable of, and did in fact provide, a safe environment for their children.

**Segal Enrolls at NYMA, Is Immediately Subjected to Physical Abuse, Sexual Abuse, and
Repeated Gang Rape**

32.     In 1996, Segal was an eleven-year-old child living with their two older sisters, mother,

and father. Segal was very small for their age, and stood at only about 4'7" and weighed

approximately 70 lbs.

33.     Segal was a very happy child, they loved to play, enjoy the outdoors, and practice their

clarinet. Segal's parents were in their fifties and adopted Segal and their siblings later in life.

Segal's parents found it hard to keep up with Segal who, like most kids their age, was brimming

with joy and energy. Segal's parents often remarked how they could never "sit still in church."

34.     In the summer of 1996, Segal's parents approached them about enrolling in NYMA.

Segal's parents told them that NYMA was a good school and a great opportunity for Segal.

Segal's parent's told Segal NYMA would teach them leadership skills and valor, they noted that

NYMA's graduates were often admitted to West Point which was just 7 miles away from

NYMA's campus. Segal found all this exciting. Even at their young age, Segal felt a strong sense

of patriotism, admired their American heritage, and looked up to its armed forces. Segal was

eager to be a part of what NYMA purported to be, and gleefully agreed to attend.

35.     In September 1996, Segal began their first year at NYMA as a fifth grader.

36.     One of the first things Segal and their parents did upon arriving at the school was meet

with Headmaster Col. Dennis Costello. Costello asked Segal if they played any instruments, and

Segal responded that they had over a year of experience playing the clarinet. Costello seemed

impressed by this.

37.     Segal was informed that they would be placed in the Band Company, even though most

kids their age would normally be placed in G Company. Segal was informed that they would still

live in the G Company barracks with other cadets their age.

38.     During their first year, Segal's usual school day started with 6:00AM formation, physical

training, and breakfast with the Band Company. Segal would then head back to G Company

barracks for classes, with approximately eight other fifth grade cadets. After classes, Segal would

return to the Band Company for lunch and band practice. Later in the day, Segal again met with

the Band Company to evening formation, marching, dinner, and taps.

39.     Immediately, senior cadets began hazing Segal along with the other new students.

40.     Segal was made to follow all "New Guy" rules. In addition to the "New Guy" rules

described above, the cadets demanded Segal memorize the definition of the word "initiative,"

provided Segal only two minutes to eat their meals, and gave Segal only four sheets of toilet

paper to use the bathroom. Segal also observed first year students with glasses have their glasses

taken away and force to live without them.

41.     Being part of Band Company was seen as an honor at NYMA, especially for a child as

young as Segal. Band Company was allowed certain benefits at NYMA, including attending

football games, participating in the Macy's Day Parade march, and attending school sponsored trips around the world.

42.     Segal was the only fifth grader in the Band Company. This attached a great deal of attention towards Segal – both good and bad. On one hand, Segal was praised by some staff and Band Company members who took a somewhat older brotherly approach towards them. On the other hand, Segal was targeted by others in NYMA, especially those in G company.

43.     While all fifth graders at NYMA were teased and physically abused, Segal was abused with disproportionately more severity.

44.     In September 1996, after evening formation with the Band Company, Segal returned to G Company barracks to go to sleep. After Segal entered their room, Segal was attacked from the behind and forced to the ground. Segal was unable to identify his attackers but could tell that it was at least two individuals. The attackers quickly covered a sheet over Segal's head and tied it around their neck.

45.     The attackers then began to beat Segal with wet socks filled with bars of soap. Segal was shocked and confused by the excruciatingly painful beating, they had no idea what was happening. Segal eventually figured out that the socks were filled with soap because when they were used to beat Segal's face, Segal could recognize the scent of the Zest brand soap that the academy issued all cadets. Segal could also feel the soap break against the harder parts of his body, like his knees and his back.

46.      Segal tried to resist and fight back but he was completely overpowered. Segal's attackers pinned them to the ground and continued to beat them for several minutes. During the attack, the attackers mocked Segal, yelling that they weren't "better than [them] because [Segal] was in

Band Company." At that point, Segal concluded that the attackers were likely G Company cadets.

47.     The beating seemed unceasing and unrelenting. Segal, only eleven years old, was not sure if they would even survive. The attackers continued until Segal was motionless and feeble on the floor. Finally, the attackers decided to stop, and left Segal alone in their room, beaten and bruised with the sheet still tied around their head.

48.     The following day, after returning to G Company barracks from the Band Company, Segal was again attacked: Segal was attacked from behind, a sheet was wrapped around their head, they were forced to the floor, and beaten with socks filling with soap bars until motionless.

49.     In the days that followed, Segal learned of "Sock n' Lock," and that this abuse was an institutionalized hazing tradition at the academy, and other G Company cadets were attacked and beaten in a similar fashion. Segal was terrified, and felt that they could not complain, out of fear they would get in trouble for rebuffing NYMA's traditions. As such, Segal did not report the attacks.

50.     For the following months, Segal was attacked in a similar fashion serval times per week. Segal could never tell who their attackers were because of the sheet wrapped around their head. The attacks varied in the number of attackers and the participants. Segal recognized that the sizes and voices of the attackers often changed. Moreover, while most of the attackers seemed to be G Company cadets, some attacks seemed to be carried out by much older students or even adults.

51.     It was particularly hard for Segal to try to identify the attackers because "Lock n' Sock" was so widely practiced by so many students.

52.     As time progressed, the attacks became more depraved and severe. The attackers began to use a variety of weapons including metal broom sticks and mops. Segal would resist these

attacks, but to no avail. After a certain point Segal acquiesced, certain the beatings were inevitable.

53.     During the beatings Segal would often become disoriented and lose consciousness, leaving themselves completely defenseless.

54.     In December 1996, these attacks escalated even further.

55.     In December, after band practice, Segal returned to barracks to go to sleep. After entering their bedroom Segal was attacked from the behind and a sheet was wrapped around their head. Segal's attacker began to beat them with wet socks filled with soaps and broomsticks. Segal attempted to fight back by staying on his feet, but was quickly overpowered.

56.     The attackers forced Segal to his hands and knees. Segal's attackers then began to forcefully remove Segal's pants. Segal tried to stop this by reaching for their pants to keep them up, but in doing this Segal left their head and body exposed. Segal's attackers took this opportunity to beat Segal in their head and body with the wet socks and broomsticks until Segal lost consciousness.

57.     Segal came in and out of consciousness during the assault. At one point, Segal regained consciousness to the sensation of something being removed from his anus, Segal could feel that his clothing had been removed. Segal was feeling vertigo and disorientation – they did not know what was happening. They could feel that their attackers had them pinned to the ground and they could not move. They then slipped out of consciousness.

58.     Segal again regained consciousness alone, naked, and on the floor with a sheet still wrapped around their head. Segal's entire body was sore and throbbing, this was a sensation Segal had grown used to considering he was so routinely beaten. What was unusual was an excruciating pain inside of Segal's rectum and anus.

59.     As an eleven year old child, Segal did not have the knowledge and therefore was unable to fully comprehend that they had been raped. However, Segal knew that they felt dirty, violated, and taken advantage of.

60.     Segal got to their feet, removed the sheet from their head, and put back on their clothes. Although it was late and the showers were closed, Segal went down to the basement shower room at barracks and took a shower. Segal was scared that they would get in trouble for showering afterhours, but they felt like they needed to shower. After the shower, Segal went back to their room and went to sleep.

61.     During the month of December, Segal was sexually assaulted and/or raped in a similar fashion as described above on several more occasions. Segal would enter their room, be forced to their hands and knees by strangers, forcibly disrobed, and sexually abused. On some occasions they would lose consciousness during the abuse. On other occasions they remained conscious; fully alert and aware while they were raped and/or other objects were inserted into their anus.

62.     Later that month, Segal returned home for holiday break. After only four months, Segal transformed from the bright-eyed energetic child excited to enroll at NYMA, to a quiet boy who preferred to be left alone.

63.     During holiday break, Segal's parents asked them how they enjoyed NYMA. Segal responded that they did not want to return the following year but did not explain why. At this point, Segal still could not register that the experiences constituted abuse and did not know how to communicate to their parents that they were being physically and sexually assaulted. Segal's parents questioned Segal's unwillingness to return, emphasizing that Segal got to be in the band.

64.     Segal responded that they did not "like G Company" and he did not "want to live with G Company." Segal's parents asked if they could live with Band Company, and Segal responded

that they were "too little." Segal's parents told them that it was important that they finished off the school year.

**Segal Returns To NYMA; The Abuse Persists, Segal Reports the Abuse, And Is Physically Reprimanded in Retaliation**

65.     In January 1997, Segal returned to NYMA for the spring semester.

66.     The physical and sexual abuse began immediately upon the start of the spring semester and continued throughout the remainder of the school year.

67.     The physical abuse was even more severe in January and began to leave visible marks such as a busted lip and bruises. Segal's emotional health also declined as they became isolated and despondent.

68.     The abuse was noticed by several members of staff, faculty, and cadets, but no one intervened to help Segal.

69.     Instead, most NYMA staff and cadets who noticed the abuse reassured Segal that the abuse was just part of NYMA culture.

70.     For example, in or about late January, Segal's band instructor, Col. Frank Forgione noticed the signs of abuse and told Segal to "tell [him] what's going on down there," referring to the G Company barracks. Forgione continued, "I know a lot of things go down in G Company."

71.     Segal responded by telling Forgione about the abuse and stated that they were "scared" whenever they were in the G Company barrack.

72.     Forgione responded that it was "ok to be afraid," in an apparent attempt of encouragement for Segal's assimilation into NYMA culture of hazing. Forgione did nothing to stop the abuse or protect Segal in any way.

73.     Upon information and belief, Forgione did not report the abuse to the authorities or anyone else outside of the academy.

74.     During this same time, several Band Company cadets also approached Segal and questioned them about their bruises.

75.     In the same vein as Forgione, the Band Company cadets tried to convince Segal that the abuse was just a rite of passage, and that they "remembered what it was like to be in G Company." The Band Company cadets offered to head into the barracks and fight the cadets abusing Segal, but Segal turned down the offer not wanting to escalate things or further the divide between themselves and the G Company cadets.

76.     In or about February 1997, Segal was in their fifth-grade class for instruction. Segal's schoolteacher, Jamie Norris, noticed the bruising on Segal's body. Norris also noticed that Segal had a limited range of motion and could not even extent their arm above their head for the class morning stretch without wincing in pain.

77.     Norris pulled Segal aside and put her hand on their back and asked, "what was going on?" Norris also asked if Segal needed "someone to talk to?' Segal was quiet and unresponsive; they were scared to talk to faculty about the hazing.

78.     Norris suggested that Segal meet and talk to the principal, Colette Austin, to discuss and report whatever was happing to them. Segal was not willing to meet with Austin at that time. The staff and cadets had ingrained in Segal that the physical and sexual abuse was simply tradition, and Segal was scared of what would happen if they complained.

79.      Moreover, Segal thought they would be punished for going outside of the chain of command, which the academy emphasized had to be followed if they had a complaint. Segal was still a first-year cadet and did not think they were allowed to oppose any conduct by other cadets – including the abuse.

80.     Upon information and belief, Norris did not report the noticeable signs of abuse to the authorities or anyone else outside of the academy.

81.     Over the following days, Segal continued to reflect on the abuse and the offer by Norris to speak to Austin. Although Segal could not fully comprehend the abuse, they knew it was painful, and made them feel violated and dirty. Segal also believed that because faculty was predominantly civilians, and not armed forces, they would not adhere to the same ridged chain of command protocols and would be less tolerant of abuse.

82.     In or about February 1997, Segal approached Norris and asked that they be permitted to speak with Austin. Norris gave Segal permission to go to the principal's office to speak with Austin.

83.     Segal went to the principal's office and sat in a waiting room in front of the office. After several minutes passed, Austin's secretary informed Segal that Austin was ready to meet with them.

84.     Segal entered Austin's office; Austin was there sitting behind her desk. Segal sat in a chair in front of Austin's desk.

85.     Austin started the conversation by saying "[Segal], what is going on?" Segal responded that late at night when they come home from band the other cadets in G Company hurt them. Segal said they did not know why the other cadets were attacking them, and said they believed it could have been because they were in band.

86.     In this same conversation, Segal explicitly stated the cadets were "touching [them]" on their "private parts" and that they were "doing things to [their] body" that made them feel "not clean." This was a clear complaint of sexual assault.

87.     Austin responded that she took the report "very seriously," and that Segal "did the right thing by coming to tell her." However, this was all lip service, as Austin then tried to excuse the conduct. Austin stated that there might be "other reasons" why the Segal was being "singled out." Austin continued to obfuscate the reason why the cadets were abusing Segal, instead of stating plainly that physical and sexual abuse was unacceptable. Austin tried to convince Segal that the other cadets' actions were somehow normal or justifiable.

88.     Austin then stated that she would report this incident to Captain Alexander and the other G Company staff.

89.     Segal left this meeting confused and not sure what, if anything, Austin would do to protect them.

90.     Upon information and belief, Austin did not report Segal's complaints of physical and sexual abuse to law enforcement or anyone else outside of the academy, and only reported Segal's complaints of physical and sexual abuse to Alexander.

91.     Shortly after Segal informed Austin they were being physically and sexually abused, Alexander called G Company cadets and Segal into formation at the G Company barracks.

92.     Alexander scolded all G Company cadets forcefully, screaming that NYMA knows that "things are going on" and that NYMA knows "people are going into other people's room at night." Alexander then threated "If I find that anyone is beating on anyone else, I will beat you myself, and if I beat you your parents won't be able to recognize you!"

93.     Alexander began to walk down the cadets in formation towards Segal.

94.     Bizarrely, Alexander then abandoned the topic of the cadets beating each other in their bedrooms at night and began to personally admonish Segal. Alexander sneered that "nobody is special in here no matter what you think you might be. Just because we have cadets who live

down here that aren't part of G Company… when you're down here I don't care what your captain says your part of G Company!"

95.     Alexander then screamed directly at Segal: ***"You don't get no special treatment down here, making up lies won't get you anywhere!"***

96.     Alexander – a fully grown adult – then slapped Segal – an eleven year old child recovering from routine beatings – across the face with enough force that Segal collapsed.

97.     Alexander then grabbed Segal by his collar and lifted him into the air and screamed: **"Stand up! I never gave you permission to hit the deck!"**

98.     It took everything Segal had to stand at rigid attention and not to burst into tears. Segal could not cry; they did not want to appear any weaker in front of G Company or illicit any more of Alexander's wrath.

99.     After this, Alexander excused the cadets.

100.    Upon information and belief, Alexander did not report Segal's complaints of physical and sexual abuse to law enforcement or anyone else outside of the academy.

101.    Segal knew that the physical and verbal reprimand by Alexander was in response to their report to faculty of the sexual abuse. Segal unquestionably learned that NYMA did not permit him to report abuse, and that any additional reports came at the cost of discipline and further abuse.

102.    Segal also interpreted Alexander's instruction not to expect "special treatment" to mean they could not expect protection from the physical and sexual abuse inherent in being a cadet at NYMA. Segal endeavored to try and live through the abuse, without any protection from the academy.

103. For the remainder of the school year, Segal was repeatedly physically abused, sexually abused, and gang raped, as described above, while in the barracks. This caused a worsening of Segal already frail and scarred emotional state.

104. In or about March 1997, Segal was on a call with their parents. This call was monitored by Alexander, who was listening from a separate phone that was set to mute.

105. During this call, Segal was suffering from a depressive episode which presented itself as a loss of enjoyment of life and feelings of enthusiasm. Indeed, Segal had become completely isolated at this point, kept to themselves, and usually remained silent.

106. Segal's parents noticed Segal's behavior was a departure from their normal happy disposition, and asked "[Segal] what is wrong with you? Why aren't you talking?" This was one of the first times since Segal started their spring semester that anyone seemed interested in his health and wellbeing.

107. Segal began to express how they felt, stating "I mean…"

108. However, before Segal could finish their sentence, Alexander unmuted his phone and interjected "I think it is time that we end this call," and added that Segal was "down because of the band." Segal was terrified they were in trouble, and so exchanged goodbyes with their parents and the call ended.

109. That same month, JROTC[2] officer Sergeant Romero approached Segal and asked if they wanted to join the drill team as a flag bearer. At the time Romero asked, Segal had bruises across both arms and a busted lip. Romero said that the drill team would help "keep [Segal] away from G Company," and help Segal "heal." Upon information and belief, Romero could tell that Segal

---

[2] Junior Reserve Officer Training Corps officers were employed by NYMA and served as part of the staff supervising and mentoring the cadets.

was being abused, and these comments were an unambiguous acknowledgement that he was aware Segal was being abused while in G Company barracks.

110.    Upon information and belief, Romero did not report the Segal's abuse to law enforcement or anyone else outside of the academy.

111.    In G Company barracks, Segal's fellow cadets' ruthlessness escalated, likely because they were emboldened by Alexander's declaration that Segal would not receive any "special treatment." Alexander's words also informed G Company that Segal likely complained about the abuse which seemed to only attract even more ire against Segal.

112.    In or about April 1997, Segal was being beaten and gang raped in their bedroom. As usual, Segal was attacked by the behind, a sheet was tied around their head, they were forcibly disrobed, and forced to their hands and knees, and penetrated in their anus by their attackers. Segal's hands and knees were on the floor while their head was on their mattress. Amongst other things, Segal was being beaten with a broken metal broom stick with a jagged end. In an effort to stop the beating, Segal raised their right hand to stop the broom stick. The jagged end of the broom stick slashed through Segal's hand, and they started to bleed profusely. Segal could see the blood from their hand collect below them as their attackers continued to rape them.

113.    After the assault, Segal was left on the floor naked, bruised, and bleeding.

114.    Segal got up, dressed themselves, and noticed that lacerations on their hand were still bleeding and deep enough that Segal could see the tissue under the skin.

115.    Segal left to the bathroom and collected a wad of toilet paper that they used to wrap their fingers to stop the bleeding.

116.     Segal then obtained a mop and began the process of cleaning up their own spattered blood.

117.    NYMA had strict rules regarding tidiness and Segal feared that they would be disciplined if staff discovered that they had bled out on their floor and sheets during the rape.

118.    Segal mopped up the blood and removed the bloody sheets, which Segal discarded. Segal asked another cadet if they could borrow a new pair of sheets and made their bed. Segal then finally went to sleep.

119.    The next day, during morning formation with the Band Company, Forgione saw the bloody wrappings around Segal's fingers and asked them "what [they] had there?" Segal showed Forgione their fingers, and Segal was sent to the infirmary for treatment.

120.    At the infirmary, Segal waited for about two hours before they were approached by a nurse, who then stated that the wounds needed to be treated right away. Segal was then placed in a waiting room. Soon after, NYMA's resident physician entered the room.

121.    The physician did not perform any diagnostic testing or ask Segal any questions about how they received their injuries.

122.    Instead, the physician did a quick visual inspection of Segal's hand and began applying stitches. Segal was not given any medication or anything else to numb the pain while the doctor applied the stitches.

123.    After the stitching was complete, the physician told Segal that they could return to barracks, which they did.

124.    To this day, Segal has scarring on their hand from the lacerations they received while being raped at NYMA.

125.    Upon information and belief, NYMA's physician did not report Segal's injuries to law enforcement or anyone else outside of the academy.

126.    In May of 1997, Segal completed his first year at NYMA and left for summer break.

**Segal's Enters the Sixth Grade At NYMA**

127.    Throughout the summer, Segal remained detached, secluded, and depressed.

128.    Over and over again, Segal told their parents that they were desperate not to return to NYMA. Unfortunately, when pressed for reasons why, Segal's internalized pain and shame prevented them from articulating the abuse that they suffered throughout their fifth-grade year.

129.    Segal still did not understand what sexual abuse and rape was. NYMA did not provide Segal with any training or classes where these concepts were explained. Segal also struggled to understand that their experience was in fact abuse; staff and cadets so emphatically referred to it as school tradition; and faculty and staff turned a blind eye to Segal's injuries stemming from the abuse. Segal was also embarrassed to talk about the invasive sexual nature of the rapes with their parents. Segal continued to reiterate that they did not like G Company, and that they did not want to live with G Company.

130.    Segal's parents did not understand the full picture, and brushed off their persistence. Segal's parents focused more on Segal's impressive fifth grade scores and performance in the band. Segal's parents thought NYMA was good for Segal, and so insisted that they return to the academy for the sixth grade.

131.    In August 1997, Segal turned twelve years old. Segal was still very small for their age.

132.    In September 1997, Segal returned to NYMA for the sixth grade. As Segal's parents drove into the academy, Segal could feel a sense of immense panic and chills throughout their body.

133.    Very little changed between Segal's fifth grade and sixth grade. Segal was still in the Band Company and was still living in the G Company, with an almost identical schedule and routine.

134.    Within days of returning to NYMA, Segal was physically and sexually abused as described above, and this abuse persisted several times a week for the following months.

135.    Segal did not report any of the physical and sexual abuse in the sixth grade to any faculty or staff at NYMA. After their prior reports were ignored and/or resulted in discipline, reporting the abuse felt like a futile effort.

136.    Much like the prior year, the abuse resulted in clearly visible bruising and lacerations throughout Segal's body. The abuse also resulted in limited ranges in motion, such as limping.

137.    Staff and faculty frequently questioned Segal about their clear physical distress, but, upon information and belief, no one at NYMA ever reported the well-known and patently obvious fact that Segal was suffering severe abuse to legal enforcement.

138.    Every day Segal became more isolated and depressed. They were in a constant state of panic and anxiety while on the campus, which spiked whenever they were in G Company barracks, terrified that they would be attacked and/or raped.

139.    In the winter of 1997, Segal joined NYMA's wrestling team. Segal decided to join the wrestling team because they wanted to learn to defend themself.

140.    Several times starting in the wither of 1997, Segal was able to fend off their attackers. Segal learned the abusers *modus operandi* and knew that if they could stop the abusers from covering their head, they could stop the attack.

141.    Unfortunately, this only worked a few times. Segal's attackers continued to overpower and physically and sexually abuse them.

142.    In or about January 1998, Segal was attacked while in barracks. On this occasion, Segal was able to overpower one of the attackers by implementing the "double leg takedown," a wrestling maneuver they learned during wrestling practice.

143.     With the attacker on the floor, Segal could identify them as former sixth grade cadet.

Segal could see this cadet rubbing his head which hit the floor during the wrestling maneuver.

The cadet grabbed the sheet that he had intended to use to blind Segal and left with several other

cadets present for the attack, whom Segal could not identify.

144.     Over the following months, Segal got into several other physical alterations inside of

barracks. While these altercations were almost entirely in self-defense, Segal began to develop a

bad reputation on campus.

145.     During this time, Segal was frequently physically reprimanded by senior cadets including

G Company Captain, Wijatmoko Sedjati, and his lieutenant, Ryan Arganta. The lieutenant in

particular used a metal broom stick to beat Segal on several occasions in the spring of 1997.

146.     In the spring of 1997, G Company cadets also began sabotaging Segal's performance.

147.     For example, cadets needed to complete their chores in a certain time allotted by staff. On

several occasion when Segal would be mopping, cadets would wait until the time allotted was

almost over and then kick over Segal's dirty mop water. When Segal tried to explain to the staff

what had happened, he would be reprimanded for "making excuses" in addition to being

reprimanded for failing to complete their chores.

148.     Throughout the spring of 1997, Segal's infractions accrued and eventually, Segal was

suspended from NYMA. Segal's parents picked them up and returned home.

149.     During their suspension, Segal begged their parents not to bring them back. Segal's

parents responded that Segal needed to finish off the school year and could join a different

school the following year.

150.     This time, Segal was far more insistent that they would not return to the school. Over

Segal's objections, their parents brought them back to the school.

151.    However, back at the academy, Segal continued to complain to faculty that they did not want to be at the school and that they did not feel safe. Segal would also insist on more frequent calls with their parents and used the opportunity to demand they take them home.

152.    In or about April 1997, Segal's parents finally removed them from the school.

153.    Segal completed the last few months of the sixth grade at a local public school.

**The Effect on Segal**

154.    Segal has been deeply affected by the trauma of being repeatedly hazed, physically assaulted, sexually assaulted, and raped during their time at NYMA.

155.    During their time at NYMA, Segal was in a constant state of terror knowing that once they returned to their barracks, they would be brutally beaten and/or raped almost every night. Segal suffered and still suffers fear, shame, embarrassment, periods of memory loss, dissociative episodes, night terrors, panic attacks, flashbacks that bring them to a place where they can't move, and depression.

156.    Segal engaged in destructive drug use to cope with the trauma and began huffing aerosol in their second year at NYMA at the age of twelve to numb their immense emotional pain.

157.    Segal still has scars from the abuse, including a scar on their hand from being slashed with the jagged end of a metal broom while being raped. Segal sees this every day and is reminded of the pain they suffered.

158.    For years, Segal experienced health issues and irregular sores in their anus, and as a child, they did not understand that they should see a doctor to treat them.

159.    Segal still struggles to understand how adults around them allowed this to go on. Segal forces themselves to repress memories of the rape and abuse to cope and attempt to move on.

Whenever they remember the abuse, they immediately take several showers because of the feeling of dirtiness.

160.     Segal continues to suffer from vivid flashbacks and panic attacks whenever they are reminded of their time at NYMA.

161.     For example, on one occasion when Segal's son tried to play sword fight with a broom, Segal became overwhelmed with fear and struck with pervasive thoughts of the academy. Segal held their hands up in terror with their voice shaking and screamed: "Stop! Stop! Stop!" Segal's son was frightened and confused, but Segal could not tell them why they were so terrified.

162.     Segal's flashbacks are so vivid that it feels as though they're reliving the rapes.

163.     Since leaving NYMA, Segal has been attended various support groups for survivors of sexual assault. Segal has also seen several therapists to help cope with the emotional distress. Segal currently attends a group therapy session twice a week and has a weekly one-on-one therapy session with their mental health provider.

**NYMA's Recklessness Continues to Have Devastating Effects, Causing Public Backlash and Multiples Lawsuits; the Academy Is Forced Into Bankruptcy**

164.     After Segal left, the academy continued to maintain a culture of hazing and abuse, and children continued to be regularly and severely harmed by these careless and inhumane policies.

165.     Upon information and belief, in the fall of 2003, a junior cadet was at academy for only nine days when he woke up to blood pouring out of his nose and face. While he was sleeping, he was clubbed in the face with a bicycle lock inside of a tube sock, as part of NYMA's "Lock n' Sock" hazing ritual. The boy suffered a broken nose and a lost tooth and left the school.

166.     The junior cadet's mother commenced a civil action against NYMA for their negligence which resulted in her child being assaulted and battered.

167.    Following this incident, three cadets were expelled from NYMA and pled guilty to charges of assault and/or attempted assault.

168.    Upon information and belief, in the fall of 2004, another junior cadet was enrolled at NYMA to train to be an Air Force pilot. In early December 2004, the junior cadet's parents got a call from a hospital near the academy, where their son had been sent because of a deep puncture wound in his leg, which bled out profusely and needed to be stapled shut.

169.    The cadet's parents asked their son what happened, the junior cadet responded that he had cut himself on a bed-string and that everything was ok.

170.    This was not true. In reality, the junior cadet was being physically abused at the academy and – like most cadets at the school – felt that he needed to lie to his parents about the true nature of his injuries to protect the academy and abide by NYMA's traditions.

171.    Just six weeks later, the junior cadet was attacked again and sent to a local hospital for a large gash to his head that was bleeding out profusely and needed to be stapled shut. The hospital called the junior cadet's parents. The parents again asked their child what happened to him, the junior cadet responded that he hit his head on his bed frame that everything was ok. This time, his parents would not accept the response. His mother told her son to tell them what was really happening and said there was no way he injured himself twice from the same bed.

172.    After some cajoling, the junior cadet finally disclosed to his parents that he was being abused.  The next day, his mother drove down to the academy and picked up her son and brought him to a nearby Dunkin' Donuts, where they sat in the parking lot in his mother's car, and the junior cadet recounted multiple beatings and routine abuse.

173.    The junior cadet told his mother that the first injury was caused by his roommate stabbing him with a broken broom handle with a jagged metal edge, and the second injury was caused by a student officer slamming his head into the lock on a metal locker.

174.    The cadet's mother returned to the academy and spoke to school official, Richard Ashton. Ashton admitted to the cadet's mother that similar complaints of assault and abuse had been reported by other students but that "everything has gone away." Ashton tried to convince her to leave her child at the academy, saying he would be put in a safe place, the academy would conduct its own internal investigation, and students would be expelled if they show a "pattern of misconduct."

175.     She asked what would happen to the senior cadet who assaulted her son, and Ashton responded that he was "in anger management," "but that doesn't make him a bad kid. He has a bad temper. According to your son, he took it out on him." Thankfully, she did not leave her child at the academy, and the cadet's parents commenced a civil action against NYMA.

176.    In an interview with the New York Times, the cadet's mother stated: "They have this wonderful mission statement, but the reality is that it's a torture chamber in there… The kids are in charge. It's 'The Lord of the Flies.'"

177.    Following this incident, a 15-year-old student was charged with second-degree assault, and a 17- year-old student officer and 18-year-old student officer faced a variety of hazing, harassment, conspiracy and assault charges.

178.    Upon information and belief, other confirmed or alleged incidents of hazing and abuse surfaced during this same time through other lawsuits, as well responses to those lawsuits and publicity.

179.    In February 2005, the local police chief sent a letter to the academy warning school officials about their abject failure in properly reporting possible criminal activity on their campus.

180.    Over the following five years, the public-relations catastrophe caused by NYMA's reckless indifference to their students' safety caused a steady decline in student admissions. Parents were no longer disillusioned by what the school purported to be and did not want to place their children in danger.

181.    At its peak, in the 1960s, NYMA enjoyed a healthy enrollment of approximately 525 cadets a year. In 2010, NYMA enrolled only 145 students. Because the academy was almost entirely dependent on tuition for its annual funds, the academy had to announce that they needed to suspend operations for the 2011-2012 school year.

182.    Upon information and belief, NYMA publicly admitted through their press releases that the negative publicity caused by the series of hazing and abuse allegations was one of the driving factors in their decision to close. They also cited other factors, such as the recession making it difficult for parents to afford tuition and a lack of financial support from alumni.

183.    After these announcements, a group of alumni were able to raise almost 6 million dollars for the academy, which kept the doors open until the fall of September 2015, when the lagging admissions forced the academy into bankruptcy and a bankruptcy auction.

184.    Upon information and belief, although NYMA was completely aware of the harm caused by their recklessness and had already fielded a flurry of lawsuits from prior students for their negligence, they did not provide specific notice of the bankruptcy proceeding to ***any*** of the children they abused or allowed to be abused, to allow those children to file their respective claims.

**Other Allegations of Sexual Abuse: VCVAWCR-DOE**[3]

185.    In or about 1980, VCVAWCR-DOE's parents admitted him to NYMA. At the time, VCVAWCR-DOE was a ten-year-old junior cadet.

186.    Soon after being admitted as a junior cadet, two lieutenants began sexually grooming VCVAWCR-DOE.

187.    Using the power provided to them by NYMA, these lieutenants promoted themselves as mentors to VCVAWCR-DOE.

188.    VCVAWCR-DOE, as a junior cadet, was taught by NYMA to obey superior officers and senior ranking cadets, and to comply with their orders and direction.

189.    Between 1980 and 1981, on multiple occasions on the premises of the NYMA, including the barracks, these two lieutenants forced VCVAWCR-DOE into performing oral sex and capitulating to anal rape.

190.    These lieutenants also ordered VCVAWCR-DOE not report the sexual abuse to higher ranking cadets, staff, or faculty at NYMA.

191.    According to VCVAWCR-DOE's complaint, NYMA knew these senior ranking cadets had unfettered and unsupervised access to younger, vulnerable cadets like VCVAWCR-DOE, in their barracks, which posed an unacceptable risk of sexual abuse and/or assault.

192.    On at least one occasion, VCVAWCR-DOE attempted to report the rape and sexual abuse to NYMA staff member, Major Dobias,

193.    However, while VCVAWCR-DOE was trying to explain the abuse to Major Dobias, Dobias grabbed him by the hair, dragged him into a bathroom, threw him up against a wall, shoved a bar of soap into his mouth, and screamed at him for not using the chain of command.

---

[3] VAVAWCR-DOE refers to a pseudonym used for the plaintiff in *VCVAWCR-DOE v. New York Military Academy, et al*, Index No. 50488/2021.

194.    Following this incident, VCVAWCR-DOE was too terrified to report the abuse to anyone inside or outside of the academy.

195.    As a result of the sexual abuse, VCVAWCR-DOE suffered and continues to suffer great physical and mental pain and anguish, severe and permanent emotional distress, psychological injuries, fear and anxiety, loss of earnings and earning capacity, and incurred expenses for medical and psychological treatment.

**Other Allegations of Sexual Abuse: JOHN DOE 54 5.G.[4]**

196.    In or about 1995, NYMA sponsored, managed, and controlled a boy scout troop program that was maintained at the academy. The troop was organized to participate in various outdoor activities such as camping and hiking. Throughout the process, members of the troop would earn merit badges upon the completion of certain tasks or after acquiring certain skills.

197.    JOHN DOE 54 F.G. was a twelve-year-old boy who joined the boy scout troop as a member. NYMA had the responsibility to care for, and assure the safety of, all members of the boy scout troop, including JOHN DOE 54 F.G.

198.    To run the boy scout troop, NYMA handled the selection of volunteers to serve various roles to teach and supervise the members of the troop.

199.    NYMA selected an individual named "Igo" to serve as a volunteer scout leader. As Scoutmaster, Igo was provided direct access to the children in NYMA's care.

200.    Igo's role as a Scoutmaster was to educate, counsel, mentor, befriend, and train the children in his custody in morality, patriotism, community services and various other skills.

201.    Igo was allowed frequent and unsupervised access with JOHN DOE 54 F.G., and used the opportunity to groom JOHN DOE 54 F.G. and sexually molest him by fondling his genitals.

---

[4] John Doe 54 5.G.4 refers to the pseudonym used by the plaintiff in *Doe v. New York Military Academy* Index No. EF005731-2021.

202.   Upon information and belief, Igo abused other members of the troop.

203.   Upon information and belief, other Scoutmasters and volunteers selected by NYMA

sexually molested other members of the troop.

204.   Due to this abuse, JOHN DOE 54 F.G suffered physical and psychological injuries

including severe emotional and psychological distress, humiliation, fright, dissociation, anger,

depression, anxiety, family turmoil and loss of faith, severe shock to his nervous system,

physical pain and mental anguish, and emotional and psychological damage

### FIRST CAUSE OF ACTION:
### Gender Discrimination in Violation of Title IX:
*(against all defendants)*

205.   Segal repeats and realleges all facts set forth above.

206.   Defendants discriminated against Segal on the basis of their gender, in violation of the

Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681-§1688 by subjecting them

to sexual assault, rape, and harassment while they were under their care as a student.

207.   The discrimination was severe.

208.   Defendants' unlawful discrimination against Segal caused them to suffer emotional and

psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation,

embarrassment, pain and suffering, and economic damages.

209.   Defendants are liable to Segal for compensatory and punitive damages, attorney's fees,

and costs.

### SECOND CAUSE OF ACTION:
### Retaliation in Violation of Title IX:
*(against all Defendants)*

210.   Segal repeats and realleges all facts set forth above.

211.    As described above, Segal made protected complaints of harassment, assault, and/or sexual assault to faculty and administrative staff.

212.    Defendants retaliated against Segal on the basis of their protected complaints of assault and sexual assault, in violation of the Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681-§1688, by failing to investigate Segal's complaints and subjecting Segal to verbal assault, physical assault, and/or harassment in retaliation for Segal bringing forth their complaints.

213.    Defendants' unlawful retaliation against Segal caused them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

214.    Defendants are liable to Segal for compensatory and punitive damages, attorney's fees, and costs.

### THIRD CAUSE OF ACTION:
### Gender Discrimination in Violation of the NYSHRL:
*(against all defendants)*

215.    Segal repeats and realleges all facts set forth above.

216.    Defendants discriminated against Segal on the basis of their gender, in violation of the New York State Human Rights Law (NY Exec Law § 296[1]) by subjecting them to sexual assault, rape, and harassment while they were under their care as a student.

217.    The discrimination was severe.

218.    Defendants' unlawful discrimination against Segal caused them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

219.    Defendants are liable to Segal for compensatory and punitive damages, attorney's fees, and costs.

**FOURTH CAUSE OF ACTION:**
**Retaliation in Violation of the NYSHRL:**
*(against all Defendants)*

220.    Segal repeats and realleges all facts set forth above.

221.    As described above, Segal made protected complaints of harassment, assault, and/or sexual assault to faculty and administrative staff.

222.    Defendants retaliated against Segal on the basis of their protected complaints of assault and sexual assault, in violation of the NYSHRL, by failing to investigate Segal's complaints and subjecting Segal to verbal assault, physical assault, and/or harassment in retaliation for Segal bringing forth their complaints.

223.    Defendants' unlawful retaliation against Segal caused them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

224.    Defendants are liable to Segal for compensatory and punitive damages, attorney's fees, and costs.

**FIFTH CAUSE OF ACTION:**
**Negligence:**
*(against all defendants)*

225.    Segal repeats and realleges all facts set forth above.

226.    Defendants owed Segal a duty of reasonable care with Segal, including a duty *in loco parentis,* to keep Segal, a child in their educational program, safe from sexual abuse and rape.

227.    Defendants owed Segal a duty to protect them from sexual assault and rape because they had an actual and/or constructive knowledge that Segal was, and would continue to be, sexually abused and raped while at the academy.

228.    Defendants breached their duty to Segal by failing to take reasonable protective measures for the foreseeable risk of harm to Segal.

229.    As a direct and proximate result of that breach, Segal has suffered emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

230.    No negligence on the part of Segal contributed to their injuries.

231.    Defendants' negligence was extreme, egregious, immoral, reckless, willfully indifferent, and shocking to the conscience.

232.    Defendants are liable to Segal for compensatory and punitive damages.

**SIXTH CAUSE OF ACTION:**
**Negligent Hiring, Supervision, and Retention**
*(against all defendants)*

233.    Segal repeats and realleges all facts set forth above.

234.    NYMA negligently hired, supervised, and/or retained personnel such as Alexander, Austin, Forgione, Norris, Romero, the infirmary physician, and other employees, who were careless, unskilled, negligent, reckless and acted in a willful and wanton manner in not possessing the requisite knowledge, skill, and moral character necessary for employees entrusted with the care of children, including Segal.

235.    NYMA employees knew or should have known that children, including Segal, in their care were being sexually abused, assaulted, and raped, but failed to do anything to stop Segal from being sexually abused, assaulted, and raped.

Case 7:21-cv-06872-VB   Document 47   Filed 11/07/22   Page 35 of 36

236.    As a direct and proximate result, Segal was injured, causing them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

237.    No negligence on Segal's part contributed to their injuries.

238.    NYMA's negligence was extreme, egregious, immoral, reckless, willfully indifferent, and shocking to the conscience.

239.    NYMA are liable to Segal for compensatory and punitive damages.

**SEVENTH CAUSE OF ACTION:**
**Breach of Statutory Duty to Report Abuse**
*(against all defendants)*

240.    Segal repeats and realleges all facts set forth above.

241.    Pursuant to N.Y. Soc. Serv. Law §§ 413 and 420, NYMA had a duty to report reasonable suspicion of abuse of children in their care.

242.    Defendants breached their duty by failing and refusing to report reasonable suspicion of sexual abuse of children in their care.

243.    As a direct and proximate result, Segal was injured, causing them to suffer emotional and psychological distress, physical injury, mental anguish, loss of enjoyment of life, humiliation, embarrassment, pain and suffering, and economic damages.

244.    NYMA are liable to Segal for compensatory and punitive damages.

**DEMAND FOR RELIEF**

WHEREFORE, it is respectfully requested that the Court enter judgment in Segal's favor:

a.    on the First, Second, Third, and Fourth Cause of Action, awarding compensatory and punitive damages, attorney's fees, and costs, as against all defendants;

b.    on the Fifth, Sixth and Seventh Cause of Action, awarding compensatory and punitive

35

damages against all defendants; and

c.   granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.


Dated: Brooklyn, New York
          November 7, 2022

Respectfully submitted,

Travis Pierre-Louise
Crumiller P.C.
16 Court St., Ste. 2500
Brooklyn, NY 11241
(212) 390-8480
travis@crumiller.com